Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISSLAW LLP**
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN BUSHANSKY,<br><br>  Plaintiff,<br><br>  vs.<br><br>MOBILEIRON, INC., SIMON BIDDISCOMBE, KENNETH KLEIN, JAMES TOLONEN, JESSICA DENECOUR, TAE HEA NAHM, ANJALI JOSHI, and RISHI BAJAJ,<br><br>  Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Stephen Bushansky ("Plaintiff"), on behalf of himself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Complaint:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against MobileIron, Inc. ("MobileIron" or the "Company") and the members of MobileIron's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which MobileIron will be acquired by Ivanti, Inc. ("Ivanti") through its wholly owned subsidiary Oahu Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2. On September 28, 2020, MobileIron issued a press release announcing that it had entered into an Agreement and Plan of Merger dated September 26, 2020 (the "Merger Agreement") to sell MobileIron to Ivanti. Under the terms of the Merger Agreement, each holder of MobileIron common stock will receive $7.05 in cash for each share of MobileIron common stock they own (the "Merger Consideration"). The Proposed Transaction is valued at approximately $872 million.

3. On October 26, 2020, MobileIron filed a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the SEC. The Proxy Statement, which recommends that MobileIron stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the Company's financial projections and the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor, Barclays Capital Inc. ("Barclays"); (ii) Barclays' potential conflicts of interest; and (iii) the background of the Proposed Transaction. Defendants authorized the issuance of the false and misleading Proxy Statement in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. In short, unless remedied, MobileIron's public stockholders will be irreparably harmed because the Proxy Statement's material misrepresentations and omissions prevent them from making

a sufficiently informed voting or appraisal decision on the Proposed Transaction. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

6.  The Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.  Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company's principal executive offices are located in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8.  Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of MobileIron.

9.  Defendant MobileIron is a Delaware corporation, with its principal executive offices located at 490 East Middlefield Road, Mountain View, California 94043. The Company is an established player in the zero trust market, and a leader in mobile-centric, zero trust solutions that go beyond traditional approaches to security by utilizing a more comprehensive set of attributes to grant

secure access. MobileIron's common stock trades on the NASDAQ Global Select Market under the ticker symbol "MOBL."

10. Defendant Simon Biddiscombe ("Biddiscombe") has served as President, Chief Executive Officer ("CEO"), and as a director of the Company since October 2017. Defendant Biddiscombe previously served as MobileIron's Chief Financial Officer from May 2015 until October 2017.

11. Defendant Kenneth Klein ("Klein") has been a director of the Company since February 2016.

12. Defendant James Tolonen ("Tolonen") has been a director of the Company since February 2014.

13. Defendant Jessica Denecour ("Denecour") has been a director of the Company since March 2017.

14. Defendant Tae Hea Nahm ("Nahm") has served as Chairman of the Board since April 2014 and has been a director of the Company since September 2007.

15. Defendant Anjali Joshi ("Joshi") has been a director of the Company since September 2019.

16. Defendant Rishi Bajaj ("Bajaj") has been a director of the Company since April 2020.

17. Defendants identified in paragraphs 10-16 are referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

18. Ivanti is a privately held company headquartered in Salt Lake City, Utah. Ivanti automates IT and Security Operations to discover, manage, secure and service from cloud to edge. From PCs to mobile devices, VDI, and the data center, Ivanti discovers IT assets on-premises, in cloud, and at the edge, improves IT service delivery, and reduces risk with insights and automation.

Ivanti also helps organizations leverage modern technology in the warehouse and across the supply chain to improve delivery without modifying backend systems.

19. Merger Sub is a Delaware corporation and a wholly owned subsidiary of Ivanti.

**SUBSTANTIVE ALLEGATIONS**

**Background of the Company**

20. MobileIron is an established player in the zero trust market, and a leader in mobile-centric, zero trust solutions that go beyond traditional approaches to security by utilizing a more comprehensive set of attributes to grant secure access. MobileIron products and services validate the device, establish user context, check application authorization, verify the network, and detect and mitigate threats before granting secure access to a device or user. Believing that traditional identity-based and gateway approaches to zero trust fall short because they provide only limited visibility into devices, applications, and threats, MobileIron seeks to redefine how customers build a secure foundation in a perimeter-less world.

21. The Company's security platform is built on the foundation of unified endpoint management ("UEM") with additional zero trust capabilities including zero sign-on ("ZSO"), multifactor authentication ("MFA"), and mobile threat defense ("MTD"). Together these products and services create a more seamless mobile experience by automating access control decisions across users, endpoints, operating systems, clouds, networks, threats, and vulnerabilities so that only trusted resources can access corporate data. Customers can deploy MobileIron solutions as either cloud services or on-premise software.

22. MobileIron targets midsize and large enterprises around the world across a broad range of industries including financial services, government, healthcare, legal, manufacturing, professional services, retail, technology, and telecommunications.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

23. On July 29, 2020, MobileIron announced its second quarter 2020 financial results, reporting revenue of $58.9 million for the quarter, a record for growth of 16% year-over-year. Total annual recurring revenue ("ARR") was $187.1 million for the second quarter 2020, up 9% year-over-year. The Company also reported record non-GAAP operating margin of 9.4% during the quarter. Furthermore, the Company was awarded three additional US patents for mobile security during the quarter, bringing MobileIron's total number of awarded patents to 98. Defendant Biddiscombe commented on the results, stating:

> In the face of the hurdles brought on by the pandemic, our team's focus and execution enabled us to grow second quarter revenue by 16% and report record non-GAAP operating margin of 9.4%. Beyond our financial accomplishments, we continued to demonstrate the leading innovation that makes MobileIron the most robust mobile-centric security platform by introducing the first multi-vector, mobile phishing protection to defend against these prominent cybersecurity threats. As remote work becomes an increasing part of many companies' future plans, it is clear that the age of the Everywhere Enterprise is dawning, where customers, workers, and infrastructure will need to converge seamlessly and securely from anywhere to connect. This new normal brings with it an increasingly complex set of security demands and we are confident that our comprehensive set of offerings are uniquely positioned to meet these challenges.

24. On October 28, 2020, MobileIron announced its third quarter 2020 financial results, reporting ARR of $191.5 million for the third quarter 2020, up 10% year-over-year. Defendant Biddiscombe commented on the results, stating:

> In Q3, MobileIron completed its transition to a subscription-led business and posted solid results, with 10% ARR growth year-over-year and operating cash flow of over $3 million. Our license model transition went smoothly with our customer base and our revenue was 95% recurring in Q3. In addition, we continued to see strong reception for our security solutions. As remote work drives our customers into the age of the Everywhere Enterprise, MobileIron will be an important part of their security solutions going forward and this could be seen in our 19% cloud revenue growth. We are confident our value proposition will continue to resonate as companies increasingly solve for remote work as the new normal.

**The Proposed Transaction**

25. On September 28, 2020, MobileIron issued a press release announcing the Proposed Transaction. The press release states, in relevant part:

MOUNTAIN VIEW, Calif., Sept. 28, 2020 -- MobileIron (NASDAQ:MOBL), the mobile-centric security platform for the Everywhere Enterprise, today announced that it has entered into an agreement to be acquired by Ivanti, Inc., a leading provider of enterprise-grade intelligent IT management and security software solutions. Ivanti today also announced it has entered into an agreement to acquire Pulse Secure LLC, a leading provider of Secure Access and mobile security solutions to enterprise customers.

Under the terms of the agreement, Ivanti will acquire all outstanding shares of MobileIron common stock for a total value of approximately $872 million in cash. MobileIron stockholders will receive $7.05 in cash per share, representing a 27% premium to the unaffected closing price as of September 24, 2020. MobileIron's Board of Directors unanimously approved the transaction and believes the transaction will maximize stockholder value.

The "future of work" now means enabling a secure workforce for the "work from everywhere" world through a mobile-centric, zero trust security strategy. By bringing MobileIron and Pulse Secure into the Ivanti portfolio, organizations will be able to manage and secure users, devices, data, and access to ensure that every device in an organization is covered, while delivering a contextual personalized employee experience. The combined company will have the ability to enable and secure the Everywhere Enterprise. Additionally, customers will benefit from the expanded scale, corporate resources, service capabilities and financial flexibility that the transaction and combined hyper-automation platform will deliver. Upon completion of the transaction, the combined company will be led by Ivanti Chairman and CEO Jim Schaper.

"We are thrilled to join forces with Ivanti and Pulse Secure in a combination that will accelerate our ability to help organizations quickly and securely embrace the future of work, in which employees, IT infrastructures and customers are everywhere – and mobile devices provide access to everything," added Simon Biddiscombe, CEO of MobileIron. "Bringing together our solutions will enable organizations to easily secure users, devices, data and access in the Everywhere Enterprise and we're confident that this transaction will enable us to deliver comprehensive security for the next generation workforce, provide enhanced opportunities for our team of employees, and better serve our customer base. We're confident this combination represents the best path forward for our stockholders and MobileIron."

Backed by Clearlake Capital Group, L.P. and TA Associates Management L.P., the combined company's solutions will extend to all devices, making Ivanti the leading provider of Unified Endpoint Management (UEM), Enterprise Service Management (ESM), and Zero Trust security solutions – and the only company on the market that provides end-to-end coverage. The transaction will enable Ivanti to deliver the most comprehensive set of solutions to discover, manage, secure, and service every endpoint for the Everywhere Enterprise, in which employees, IT infrastructures and customers are everywhere — and mobile devices provide access to everything.

"By combining MobileIron and Pulse Secure with Ivanti, we are creating a leader in the large and growing Unified Endpoint Management, Security and Enterprise Service Management markets. We now have the most comprehensive set of software solutions that addresses the growing market demand for the future of work," said Jim Schaper, Ivanti Chairman and CEO. "With the integration of our industry knowledge and complementary product offerings, Ivanti will be well positioned to provide our expansive customer base with the critical tools needed to tackle IT challenges in the new normal. We welcome MobileIron's and Pulse Secure's employees, customers, and partner network to the Ivanti family, and thank Clearlake and TA Associates for their strong support in enabling these transformational transactions."

"The Pulse Secure team is excited to join the Ivanti family in the next chapter of growth for the combined platform," added Sudhakar Ramakrishna, CEO of Pulse Secure. "We believe that organizations looking for Unified Endpoint Management and Secure Access solutions will see the combined platform as a new, highly focused partner with the capabilities to deliver a complete, best-in-class, global solution. We appreciate Siris Capital for their phenomenal support over the past six years, which enabled us to invest in our products, people, and clients in order to achieve a wonderful outcome for shareholders and find a great home."

**Transaction Highlights**

- Under the terms of the agreement with MobileIron, Ivanti will acquire all outstanding shares of MobileIron common stock for a total value of approximately $872 million. MobileIron stockholders will receive $7.05 in cash per share, representing a 27% premium to the unaffected closing price as of September 24, 2020.

- MobileIron's Board of Directors unanimously approved the deal and believes the transaction will maximize stockholder value.

- Morgan Stanley Senior Funding, Inc., BofA Securities, UBS Investment Bank, and BMO Capital Markets are providing debt financing for the acquisitions.

- The closing of the transaction is expected in late Q4, subject to approval by MobileIron stockholders and the satisfaction of regulatory and customary closing conditions.

**The Proxy Statement Contains Material Misstatements or Omissions**

26. The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to MobileIron's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

27. Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning, among other things: (i) the Company's financial projections and the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor, Barclays; (ii) Barclays' potential conflicts of interest; and (iii) the background of the Proposed Transaction. Accordingly, MobileIron stockholders are being asked to make a voting or appraisal decision in connection with the Proposed Transaction without all material information at their disposal.

**Material Omissions Concerning the Company's Financial Projections and Barclays' Financial Analyses**

28. The Proxy Statement omits material information regarding the Company's financial projections.

29. For example, the Proxy Statement fails to disclose the line items underlying the Company's EBITDA, net income and unlevered free cash flow over the projection period.

30. Additionally, the Proxy Statement omits material information regarding Barclays' financial analyses.

31. The Proxy Statement describes Barclays' fairness opinion and the various valuation analyses performed in support of its opinion. However, the description of Barclays' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, MobileIron's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Barclays' fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek appraisal.

32. With respect to Barclays' *Selected Comparable Company Analysis* and *Selected Precedent Transaction Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for each of the companies and transactions observed by Barclays, respectively.

33. With respect to Barclays' *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the projected after-tax unlevered free cash flows used in the analysis, if different from the Company's unlevered free cash flow figures set forth on page 48 of the Proxy Statement; (ii) quantification of the terminal values of MobileIron; (iii) the individual inputs and assumptions underlying the range of after-tax discount rates of 9.5% to 11.5%; (iv) the implied terminal multiples and perpetuity growth rates resulting from the analysis; (v) the Company's estimated net debt as of June 30, 2020; (vi) the estimated present value of the company's NOLs; and (vii) the fully diluted number of shares of MobileIron common stock.

34. With respect to Barclays' *Equity Analyst Target Prices Analysis*, the Proxy Statement fails to disclose: (i) the price targets observed in the analysis; and (ii) the sources thereof.

35. With respect to Barclays' *Illustrative Leveraged Acquisition Analysis*, the Proxy Statement fails to disclose Barclays' basis for assuming: (i) a debt capital structure of MobileIron comprised of pro forma leverage of total debt to last-twelve month revenue of 1.5x; (ii) an equity investment that would achieve a rate of return of approximately 15% to 23% during a 5.5 year period; and (iii) a projected non-GAAP EBITDA terminal value multiple of 9.0 to 12.0x.

36. With respect to Barclays' *Illustrative Transaction Premium Analysis*, the Proxy Statement fails to disclose: (i) each of the transactions observed in the analysis; and (ii) the premiums paid in each of the transactions.

37. Without such undisclosed information, MobileIron stockholders cannot evaluate for themselves whether the financial analyses performed by Barclays were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully

evaluate the extent to which Barclays' opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction or seek appraisal.

38.     The omission of this material information renders the statements in the "Forward-Looking Financial Information" and "Opinion of MobileIron's Financial Advisor" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Barclays' Potential Conflicts of Interest***

39.     The Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Barclays.

40.     For example, the Proxy Statement sets forth:

> Barclays and its affiliates in the past have provided, currently are providing, or in the future may provide, investment banking services to Ivanti's principal stakeholder and the other party that had entered into the Joinder . . . and certain of their respective affiliates and portfolio companies and have received or in the future may receive customary fees for rendering such services, including (i) having acted or acting as financial advisor to such parties and certain of their respective portfolio companies and affiliates in connection with certain mergers and acquisition transactions; (ii) having acted or acting as arranger, bookrunnner and/or lender for such parties and certain of their respective portfolio companies and affiliates in connection with their respective corporate finance needs, including providing financing for various acquisition transactions; and (iii) having acted or acting as underwriter, initial purchaser and placement agent for various equity and debt offerings undertaken by such parties and certain of their respective portfolio companies and affiliates.

Proxy Statement at 46. The Proxy Statement fails, however, to disclose the amount of compensation Barclays has received or will receive for providing such services to Ivanti's principal stakeholder and the other party that had entered into the Joinder and certain of their respective affiliates and portfolio companies.

41.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

42. The omission of this material information renders the statements in the "Opinion of MobileIron's Financial Advisor" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background of the Proposed Transaction***

43. The Proxy Statement fails to provide material information regarding the background of the Proposed Transaction.

44. The Proxy Statement fails to disclose whether Company C's September 21, 2020, letter re-affirming its non-binding proposal for an all-cash acquisition of the Company with a proposed purchase price of $7.25 per share was contingent on the Company also acquiring Company B.

45. Additionally, the Proxy Statement fails to disclose how Company C communicated to the Company that it would not proceed with any further proposal with respect to an acquisition of the Company and whether Company C provided any reasons for not proceeding any further with respect to an acquisition of the Company.

46. The omission of this material information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

47. The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other stockholders of MobileIron will be unable to make an informed voting or appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

# CLAIMS FOR RELIEF

## COUNT I

**Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

48.     Plaintiff repeats all previous allegations as if set forth in full.

49.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

50.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the Company's financial projections, the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Barclays, Barclays' potential conflicts of interest and the background of the Proposed Transaction.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

51.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or seek to exercise their appraisal rights.

52.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

53.     Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Claims Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

54.     Plaintiff repeats all previous allegations as if set forth in full.

55.     The Individual Defendants acted as controlling persons of MobileIron within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of MobileIron, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

56.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

58.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

59.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, MobileIron's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of MobileIron, and against defendants, as follows:

A.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to MobileIron stockholders;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

- 15 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| | |
|---|---|
| Dated: October 30, 2020 | **WEISSLAW LLP** <br> Joel E. Elkins <br><br> By: */s/ Joel E. Elkins* <br><br> Joel E. Elkins <br> 9107 Wilshire Blvd., Suite 450 <br> Beverly Hills, CA 90210 <br> Telephone: 310/208-2800 <br> Facsimile: 310/209-2348 <br> -and- <br> Richard A. Acocelli <br> 1500 Broadway, 16th Floor <br> New York, NY 10036 <br> Telephone: 212/682-3025 <br> Facsimile: 212/682-3010 <br><br> *Attorneys for Plaintiff* |